**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**Urbana Division**

| | |
|---|---|
| **MICHAEL S. WILLIAMS,** ) | |
|                     **Plaintiff,** ) | |
| v. ) | |
| ) | **Case No. 06-2170** |
| **MICHAEL J. ASTRUE,** ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
|                     **Defendant.** ) | |

# O R D E R

In January 2006, Administrative Law Judge (hereinafter "ALJ") James Gildea denied Plaintiff Michael Williams' applications for Supplemental Security Income (hereinafter "SSI") and Disability Insurance Benefits (hereinafter "DIB"). ALJ Gildea based his decision on a finding that Williams was not disabled because he was able to perform a significant number of jobs available in the national economy. The parties have consented to the exercise of jurisdiction by a federal magistrate judge.

In September 2006, Williams filed a complaint against Defendant Michael Astrue,[1] the Commissioner of Social Security (hereinafter "Commissioner"), seeking judicial review of the ALJ's decision to deny him social security benefits. In March 2007, Williams filed a Motion for Summary Judgment (#16). In May 2007, the Commissioner filed a Motion for an Order Which Affirms the Commissioner's Decision (#18). After reviewing the administrative record and the parties' memoranda, this Court **GRANTS** Plaintiff's Motion for Summary Judgment **(#16)**.

### I. Background
### A. Procedural Background

Williams filed his applications for DIB and SSI in February 2003, claiming that he had become disabled and unable to work in July 2001 because of degenerative disc disease and

---

[1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael Astrue was substituted for Jo Anne Barnhart as the defendant in this suit.

cervical arthritis.  (R. 104-06.)  The Social Security Administration (hereinafter "SSA") denied Williams' application initially in May 2003 and on reconsideration in September 2003.  (R. 43-46, 50-52.)  In September 2003, Williams requested a hearing.  In July 2005, ALJ Gerard Rickert convened the hearing (R. 473) and allowed Williams to postpone the hearing so that he could obtain counsel.  In October 2005, ALJ Gildea held a second hearing.  (R. 478-80.)  ALJ Gildea issued his decision in January 2006, denying Williams benefits on the basis that he was not disabled because he was able to perform a significant number of jobs available in the national economy.  (R. 40.)  In July 2006, the Appeals Council denied Williams' request for review, making ALJ Gildea's decision the final decision of the Commissioner.  (R. 10.)  Williams subsequently filed the current action for review of ALJ Gildea's decision.

### B. Plaintiff's Medical Background

Williams was thirty-seven years old at his alleged onset date of July 11, 2001, and forty-one on the date of the ALJ's decision.  (R. 485.)  He had completed one year of college and previously worked as a processing plant worker at a meat packing plant, lab tech and lab manager for an eyeglass maker, and delivery driver for a flower shop.  (R. 126.)

In March 2001, Dr. James Frame diagnosed Williams with cervicalgia after Williams entered the hospital emergency room complaining of neck pain and tingling in his left arm.  (R. 243-44.)  In May 2001, a cervical CT scan revealed a small spur at C3-C4 causing a minor indentation of the positive contrast anterior to the cord.  (R. 242.)

In August 2001, Dr. Matthew Black diagnosed Williams with cervical degenerative disc disease.  In August, September, and December 2001, Williams received epidural steroid injections.  (R. 225, 227.)  Throughout 2001 and 2002, Williams went to the hospital emergency room for neck pain and received pain medication.  (R. 275-314.)

In July 2002, Dr. Black performed an x-ray scan of Williams' lateral cervical spine which revealed minimal anterior wedging at C5.  (R. 285.)  In December 2002, a CT scan of the cervical spine revealed degenerative disc changes at C3-C4 and C4-C5 consistent with

desiccation and degenerative disc disease, mild posterior disc bulge at C3-C4, and unilateral right-sided foraminal narrowing at C3-C4 that appeared to be related to bony spurring. (R. 437.) Also in December 2002, Dr. Christian Wagner expressed doubt that Williams' condition would require surgery but referred Williams to a neurosurgeon, Dr. Judith Lee-Sigler, for an MRI scan and further evaluation of his cervical neck pain. (R. 337-39.)

In February 2003, Dr. Lee-Sigler reviewed Williams' MRI and opined that Williams' neck and upper limb pain was attributable to several factors including cervical degenerative disc disease and arthritic changes resulting in neural foraminal narrowing at the C3-C4 areas. (R. 333.) In addition, Dr. Lee-Sigler noted that she believed the numbness to be secondary to thoracic outlet syndrome. (R. 333.)

In May 2003, Dr. Lee-Sigler diagnosed Williams with functional right thoracic syndrome with myofascial pain and cervical spondylosis and recommended a series of trigger point injections. (R. 389.) Williams underwent a series of trigger point injections between May and June 2003. (R. 381-86.) In June 2003, Dr. Lee-Sigler noted that the injections had not helped Williams and referred Williams to physical therapy. (R. 378-79.)

In May 2003, a state agency medical consultant reviewed the evidence and opined that Plaintiff was capable of performing light work that did not require more than occasional overhead reaching. (R. 404-11.)

In July 2003, Dr. Wagner performed another MRI scan that showed degenerative changes of the cervical spine at the C3-C4 and C4-C5 levels with preferential narrowing of the right neuroforamen. (R. 374, 393.) In October 2003, Dr. Wagner diagnosed Williams with cervical neck syndrome. (R. 417.) In November 2003, an MRI scan of the cervical spine revealed minimal degenerative disc changes. (R. 421.)

Throughout 2005, Williams visited the emergency room because of his neck pain and received pain medications and consistent diagnoses of chronic neck pain. (R. 426, 429-31.) He

also saw Dr. Simone Hampton a number of times between December 2004 and May 2005. She diagnosed Williams with chronic pain and depression likely associated with that pain. (R. 425-26, 429-33.) In July 2005, an MRI scan of the cervical spine revealed minimal right paracentral disc protrusion at C3-C4. (R. 451.) In an October 2005 questionnaire, Dr. Hampton reported that Plaintiff had neuro-anatomic distribution of pain, limited spinal motion, motor loss, muscle weakness, arachnoiditis, severe burning or painful dysesthesia, and needed to change his position more than once every two hours. She stated that, in her opinion, the patient suffered from severe pain, he could work only one hour a day, stand or sit only fifteen minutes at a time, frequently lift five pounds, and occasionally rotate his neck to the left or elevate his chin. Finally, she stated that he was unable to bring his chin to his neck or rotate his neck to the right. (R. 457.) In addition, in a letter dated October 10, 2005, Dr. Hampton stated as follows:

> Michael Williams is in need of surgery for his very significant neck pain due to cervical arthritis and a narrowed foramina at C4-C5. He has weakness and occasional numbness in his right hand. His most debilitating symptom is pain . . . . Due to the medications he is taking he should not be operating equipment. Mr. Williams will not improve until he has surgery for this problem.

(R. 458.)

### C. The Hearing Before the ALJ

ALJ Gildea held an administrative hearing in October 2005 at which Williams and vocational expert (hereinafter "VE") James Lanier testified.

Williams testified that he stopped working in March or April of 2001 and stopped driving around April 2005 because of his medications. (R. 488.) Before April 2001, Williams worked as a delivery driver for two years and did not seek other employment after quitting that job. (R. 488-89.) Williams previously worked for six and a half years as a lab technician making lenses for glasses and had other temporary jobs before that. (R. 489-90.)

When ALJ Gildea questioned him about his medications, Williams testified that he took 600 milligrams of Neurontin three times daily and 350 milligrams of Soma four times daily.

(R. 491.)  Williams also testified that he had trouble focusing and problems with his short-term memory, but that he was not sure if those problems resulted from his medications.  (R. 492.)

Williams testified that he began noticing his neck problems in March or April of 2001 when his arm would periodically go numb.  (R. 493.)  Doctors diagnosed Williams with degenerative disc disease and treated him with epidural steroid injections which gave him some relief.  (R. 494.)

Williams testified that he engages in no activities, can only sleep for about an hour at a time, spends twelve to sixteen hours a day in bed, and can only sit or stand for fifteen to twenty minutes at a time.  (R. 496-97, 499.)  Williams also testified that he could not type with his right hand for more than a few minutes and could not lift heavy objects with his right arm.  (R. 501.) Williams testified that he can turn his neck to the left occasionally but experiences severe pain when he tries to turn his neck to the right.  (R. 497.)

Williams indicated that he experienced pain varying from a three to a seven (on a scale of one to ten with ten being the most severe) and that the pain he experiences is constant.  (R. 508.) As treatment for this pain, Dr. Lee-Sigler provided Williams with forty-nine trigger-point injections over a three-month period.  (R. 489.)

ALJ Gildea called the VE to testify and asked him if a person of the same age as Williams, and having the same education, experience, and limitations, would be able to perform Williams' past relevant work.  (R. 517.)  ALJ Gildea described Williams as being able to lift up to twenty pounds occasionally, up to ten pounds frequently, to stand or walk up to six hours, and to sit for up to six hours.  (R. 517.)  The ALJ also described Williams as being unable to climb ladders, ropes, or scaffolds and unable to more than occasionally balance, stoop, kneel, crouch, crawl, reach overhead, or climb ramps or stairs.  (R. 517-18.)  ALJ Gildea further described Williams as unable to frequently use his right dominant upper extremity.  (R. 518.)

The VE testified that a hypothetical person with such education, experience, and limitations would not be able to perform Willilams' past relevant work. (R. 518.) However, the VE testified that the same person would be able to perform several jobs within the regional economy including 3,025 sedentary ticket checker positions, 4,436 sedentary information clerk positions, 3,327 light information clerk positions, 896 sedentary messenger positions, 6,806 light messenger positions, and 1,497 light laundry worker positions. (R. 518.)

On examination by Williams' attorney, the VE testified that if the hypothetical person could not sit or stand for more than fifteen minutes at a time, he would not be able to perform any of the light jobs, but the sedentary jobs include a sit-stand option, so he could perform those jobs. (R. 518-19.) The VE also testified that if the individual could not turn his head to the right, it would not adversely affect the person's ability to do the remaining jobs, but if he could not bring his chin to his neck that would eliminate all of the listed jobs. (R. 520-21.)

### D. The ALJ's Decision

A claimant is disabled within the meaning of the Social Security Act if he satisfies the five-step inquiry set forth in 20 C.F.R. § 416.920(a)(4). According to the five-step inquiry, the ALJ must consider (1) the claimant's current work activity, if any; (2) the severity of the claimant's impairment; (3) whether the claimant's impairment meets or exceeds one of a list of specific impairments; (4) whether the claimant can still perform his past relevant work; and (5) whether the claimant is able to perform any other work within the economy.

ALJ Gildea made the following findings: (1) Williams had not engaged in substantial gainful activity since the alleged onset of his disability; (2) Williams' degenerative disc disease and cervical arthritis were "severe" under the Social Security Act and Regulations, but these impairments did not meet or equal one of the impairments listed in Regulation No. 4, Subpart P, Appendix 1; (3) Williams' allegations regarding his limitations were not totally credible because the degree of pain and limitation alleged were not consistent with the objective medical evidence regarding the impairments or Williams' functional ability including his reported daily activities; (4) Williams retained the residual functioning capacity (hereinafter "RFC") to perform a

restricted range of light work that includes lifting or carrying of up to twenty pounds at most or ten pounds frequently, sitting, standing or walking for up to six hours per day, no climbing ladders, ropes, or scaffolds, only occasional climbing of ramps and stairs and overhead reaching, and frequent handling and fingering with his right dominant upper extremity; (5) based on the above RFC, Williams was able to perform a significant number of jobs in the national economy. As a result, ALJ Gildea concluded that Williams was not disabled. (R. 39-40.)

## II.  Standard of Review

Section 205(g) of the Social Security Act (42 U.S.C. § 405(g)) authorizes judicial review of the Commissioner's final decision.  When, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.  The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is more than a "mere scintilla" of evidence but can be less than a preponderance; it is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly.  *Id.* at 399-400.

Judicial review is limited to determining whether substantial evidence supports the ALJ's findings and whether the ALJ applied the correct legal standards in reaching his decision. 42 U.S.C. § 405(g).  A reviewing court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner.  *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).

## III.  Discussion

Williams argues that the Court should reverse the ALJ's decision because it was not supported by substantial evidence.  Specifically, Williams argues that (1) ALJ Gildea erroneously disregarded the opinions of Williams' treating physicians; (2) ALJ Gildea erred by

finding Plaintiff to be not entirely credible; and (3) ALJ Gildea erred when he determined Williams' RFC and presented hypothetical questions to the VE.

### A.  The Treating Physicians' Opinions

Williams first argues that the Court should grant summary judgment in his favor because (1) the ALJ erred by failing to give Dr. Hampton's opinion adequate or controlling weight; (2) ALJ Gildea did not adequately articulate his justification for disregarding the opinion of Dr. Hampton; (3) ALJ Gildea did not recontact Dr. Hampton for clarification of his opinion; and (4) ALJ Gildea erroneously evaluated opinions from other treating physicians.

#### 1.  Dr. Hampton's Opinion

Williams contends that ALJ Gildea erred by failing to give Dr. Hampton's opinion sufficient weight.  Specifically, Plaintiff refers to Dr. Hampton's opinion that Plaintiff would be able to work only one hour per day, sit or stand for only fifteen minutes at one time, lift five pounds occasionally or frequently, only occasionally rotate his neck to the left and elevate his chin, and is unable to rotate his neck to the right or bring his chin to his neck.  In addition, Dr. Hampton opined in a letter that Plaintiff needed surgery.

"The opinion of a treating physician is given controlling weight if it is well supported by medically acceptable clinical or laboratory diagnostic testing and not inconsistent with other substantial evidence in the record."  20 C.F.R. § 404.1527(d)(2); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 818 (N.D. Ill. 2006).  If the treating physician's opinion is inconsistent with the rest of the evidence, then it is not entitled to controlling weight, and the ALJ must weigh it using the factors applied to all other medical opinion evidence.  *Id.*  Finally, the ALJ must articulate his reasons for the weight he chooses to give the treating physician's opinion.  SSR 96-2p; SSR 96-5p.

The ALJ accorded little weight to Dr. Hampton's opinion, stating that "the findings [she] checked upon this questionnaire are inconsistent with the objective medical evidence as a whole and Dr. Hampton's own progress notes (Exhibit 9F)."  (R. 35.)  Plaintiff argues that the ALJ

erred by (1) failing to adequately articulate his reasoning, and (2) finding that Dr. Hampton's opinion in the letter was not supported by or consistent with the medical record.

Regarding Plaintiff's argument that the ALJ did not articulate his reasoning, the Court disagrees. The ALJ stated as follows:

> In assessing the claimant's residual functional capacity, the undersigned has noted no physician, other than Dr. Hampton, imposed any specific work related restrictions. The undersigned has considered Dr. Hampton's opinion that the claimant is essentially unable to perform any type of work even sedentary work, but do [(*sic*)] not find these conclusions are supported by the objective medical findings, or consistent with the longitudinal medical record. Dr. Hampton indicated that the claimant had motor loss, arachnoiditis, and neuro-anatomic distribution of pain. None of these findings are indicated in Dr. Hampton's progress reports or those of any other physician (exhibits 9F, 5F-8F). [(*sic*)]

(R. 36.) An ALJ is required to articulate his reasoning so that the Court can assure itself that the ALJ considered all important evidence and also so that the Court can properly follow the ALJ's reasoning. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). This paragraph and the ALJ's discussion of the medical record adequately explains the ALJ's reasoning and is not so inadequate that the Court cannot review the decision to reject Dr. Hampton's opinion as indicated in the questionnaire. Therefore, the Court cannot conclude that the ALJ erred by failing to adequately articulate his reasoning.

Regarding Plaintiff's argument that the ALJ erred by finding that Dr. Hampton's opinion was not supported by or consistent with the medical evidence, Dr. Hampton's notes indicate that she treated Plaintiff for approximately six months, from December 2004 through May 2005. During that time, her clinic notes mention his regular complaints of pain, his depression, his medication and need for refills, and his statements regarding his attempts to see a Chicago neurosurgeon. Nevertheless, not until she completed the questionnaire in October 2005 did Dr. Hampton mention that Plaintiff had any physical limitations. Regarding Plaintiff's claims of restricted motion in his neck, for example, Dr. Hampton's notes do not mention that Plaintiff had any trouble turning his neck left or right or lowering his chin to his chest. Dr. Hampton's May 2, 2005, notes indicate that Plaintiff says his neck pain is worse, however, on physical examination,

9

she noted that his neck is "supple." (R. 425.) Her notes dated January 3 and 24, February 22, and April 14, 2005, list chronic neck pain as a problem, and again her physical exam states his neck was supple. (R. 426.) At all other appointments including December 8, 2004, February 10, 2005, April 6 and 27, 2005, and May 21, 2005, Dr. Hampton consistently noted that his neck was supple on physical examination. (R. 425-26, 430, 432.) Her notes never refer to any difficulty Plaintiff had turning his neck to left or right or lowering his chin.

In addition, Plaintiff has failed to point to any medical evidence of physical limitations. In the absence of medical evidence supporting the physical limitations Dr. Hampton listed in her October 2005 letter, the Court cannot conclude that the ALJ erred by determining that Dr. Hampton's opinion did not merit significant weight.

### 2.  Recontact for Clarification

Plaintiff also contends that ALJ Gildea failed in his duty to recontact Dr. Hampton to seek additional evidence regarding her opinion.

The regulations state that the ALJ will "seek additional evidence or clarification from [a] medical source when the report from [that] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e). When confronting an opinion from a treating physician, "the rules . . . require that [the ALJ] make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear." SSR 96-5p.

ALJ Gildea decided that Dr. Hampton's opinion did not merit "significant weight" (R. 35) because it was unsupported by objective medical findings and it was inconsistent with other medical evidence. (R. 36.) Nothing in the rules requires an ALJ to recontact a treating physician to reconcile inconsistencies in the record. Rather, when a treating doctor's opinion is inconsistent with other evidence, it is not given controlling weight and is instead weighed

together with all of the evidence. 20 C.F.R. § 404.1527(c)(2). According to the Seventh Circuit, an ALJ must recontact medical sources "only when the evidence received is inadequate to determine whether the claimant is disabled." *See* 20 C.F.R. § 404.1512(e); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the evidence was adequate for the ALJ to find that Plaintiff was not disabled, and the ALJ acted within his discretion in deciding not to call a medical expert. *See* 20 C.F.R. § 404.1527(f)(2)(iii); *Skarbeck*, 390 F.3d at 504. Thus, the ALJ's failure to recontact Dr. Hampton does not constitute reversible error.

### 3. Other Treating Physicians' Opinions

Williams next argues that ALJ Gildea erroneously rejected the opinions of Dr. Wagner and Dr. Lee-Sigler. Specifically, Plaintiff contends that the ALJ erred when he stated that Dr. Wagner and Dr. Lee-Sigler "did not reveal his complaints of pain were related to the cervical findings." (R. 36.) In response, Defendant states only that neither of these doctors opined that Plaintiff was disabled or functionally limited.

Dr. Lee-Sigler expressed an opinion that Williams' pain resulted from cervical degenerative disc disease and arthritic changes resulting in neural foraminal narrowing at the C3-C4 areas. (R. 333.) In July 2003, Dr. Wagner ordered an MRI that showed degenerative changes of the cervical spine at the C3-C4 and C4-C5 levels with preferential narrowing of the right neuroforamen (R. 374, 393) and in October 2003, Dr. Wagner diagnosed Williams with cervical neck syndrome (R. 417). Thus, ALJ Gildea was incorrect in stating these doctors did not relate Plaintiff's pain to the cervical findings.

Nevertheless, the ALJ's assessment of Plaintiff's RFC is not based on that error. Instead the ALJ considered whether Dr. Wagner and Dr. Lee-Sigler (or any physician other than Dr. Hampton) observed or imposed any work-related restrictions on Plaintiff as a result of his physical condition. The ALJ accurately observed that no physician (other than Dr. Hampton) did so. Furthermore, the ALJ acknowledged that Plaintiff has degenerative disc disease of the cervical spine and cervical arthritis, and further acknowledged that those impairments could reasonably be expected to cause pain and limitations. Accordingly, the Court concludes that the

ALJ's misstatement regarding the doctors' assessments of the cause of Plaintiff's pain does not constitute reversible error. *See Keys v. Barnhart,* 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).

### B. ALJ Gildea's Credibility Finding

Williams next argues that the ALJ erred by determining that Williams' claims regarding his limitations were not credible because the ALJ did not properly assess Williams' complaints of pain, the effect of his medications, and his daily activities.

> Regarding Plaintiff's credibility, the ALJ stated as follows:
>
> In assessing the claimant's residual functional capacity, the undersigned has considered the claimant's complaints of pain and resulting functional limitations, but do [(*sic*)] not find them credible to the extent they are inconsistent with the residual functional capacity as described above. The undersigned notes that the claimant has degenerative disc disease of the cervical spine and cervical arthritis, which are impairments that could reasonably be expected to cause pain and limitation. However, the degree of pain and limitation alleged by the claimant, is not consistent with the objective medical evidence regarding these impairments, or his functional ability, including his reported daily activities.

(R. 36.)

The Court defers to an ALJ's credibility determination and will not reverse that determination unless the claimant can show the decision was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Nevertheless, "[t]he ALJ's discretion is not unlimited . . . and the ALJ must undertake a thorough examination and explanation when making credibility determinations." *Frobes*, 467 F. Supp. 2d. at 821. The ALJ must provide specific reasons for his credibility determination based on evidence in the record. SSR 96-7p; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The Court will affirm the ALJ's credibility determination "as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek*, 390 F.3d at 505.

Regarding the effect of medication, the ALJ recited the medications that Plaintiff was taking. He stated that, although Plaintiff testified that he had some side effects, including trouble focusing, the record contained no evidence of side effects. (R. 36.) He also stated that Plaintiff may have mild difficulties in maintaining social functioning and concentration, persistence, or pace, possibly due to his depression and the medication he took for it. (R. 37.)

Plaintiff contends that the ALJ failed to consider side effects of his medication in light of the requirements of SSR 96-7p. In his motion, Plaintiff listed all the medications he takes, however, he did not refer to any evidence in the record that would support a finding that he experiences debilitating side effects, other than Plaintiff's own testimony. Based on Plaintiff's failure to present any evidence in support of his argument, the Court cannot conclude that the ALJ erred in his consideration of side effects.

However, regarding Plaintiff's daily activities, the ALJ stated that the degree of pain and limitation Plaintiff claims is not consistent with his reported daily activities. The ALJ referred to Plaintiff's daily activities at least twice in his decision, but without explanation or any reference to the record, so it is unclear what activities or report of activities he was referring to.

At the hearing, Williams testified that he basically did nothing, but in a earlier report (dated April 2003) to the SSA, Williams indicated that he engaged in activities such as fixing things and doing yard work. (R. 142-48.) Even in this report however, Williams indicated that he could mow the lawn only when feeling up to it and that he had to take breaks often, quadrupling the amount of time it used to take him to do the work. (R. 148.) Furthermore, he could (at that time) only stand or walk for thirty minutes to an hour, he had trouble gripping things and reaching overhead, and he could not ride in a car for long periods of time. (R. 147-48.) In April 2003, as well as in subsequent reports (dated June and July 2003), Williams stated that he cannot do housework or yardwork, he is unable to drive (R. 155), and he spends most of the time in bed because of pain (R. 148). The Court cannot find any evidence in the record that Plaintiff engaged in any daily activities that seriously undermine his claim of debilitating pain. Thus, Williams' reported daily activities are not inconsistent with his complaints of pain and, in

fact, indicate significant pain-induced limitations. More importantly, they do not support the ALJ's credibility assessment.

Nevertheless, Plaintiff's daily activities are not the only reason the ALJ discounted Plaintiff's credibility. He also referred generally to "objective medical evidence" and Plaintiff's "functional ability." (R. 36.) With regard to the objective medical evidence, the ALJ acknowledged that Plaintiff suffers from degenerative disc disease of the cervical spine and cervical arthritis, stating that those are impairments "that could reasonably be expected to cause pain and limitation." (R. 36.) "Once the claimant produces medical evidence of an underlying impairment, the [ALJ] may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)). Moreover, "in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." 20 C.F.R. § 404.1529(c)(2); *Carradine*, 360 F.3d at 753 (quoting *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)). As to the functional limitations, the ALJ cannot, of course, use his own RFC determination to conclude that Plaintiff is not credible if that RFC is based on discounting Plaintiff's claims regarding his pain and limitations. That would be a circular argument.

Unfortunately, the ALJ's explanation for rejecting Plaintiff's complaints of pain and resulting limitations was brief and conclusory. Without more information, the Court cannot follow the ALJ's reasoning and assure itself that the ALJ considered all important evidence. Accordingly, the Court remands the case so the ALJ can evaluate Plaintiff's complaints of pain in light of the factors listed in 20 C.F.R. § 404.1529(c)(3), SSR 96-7p, and SSR 97-7p. A thorough explanation of his reasoning will aid the Court in reviewing the ALJ's credibility determination.

### C. Williams' RFC

Last, Williams argues that ALJ Gildea's RFC finding that Williams is capable of performing a significant range of light work is not supported by substantial evidence and that

ALJ Gildea did not pose a complete hypothetical question to the VE.  Because the RFC is based on the credibility finding, the Court cannot consider these issues at this time.

### IV.  Summary

For the reasons set forth above, this Court **GRANTS** Plaintiff's Motion for Summary Judgment **(#16)** on the basis of the ALJ's credibility findings.  The Court orders that the decision be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g)[2] for further consideration consistent with this order.

ENTER this 25th day of October, 2007.

s/ DAVID G. BERNTHAL<br>
U.S. MAGISTRATE JUDGE

---

[2] Under 42 U.S.C. § 405(g), sentence four, "[t]he court shall have power to enter, upon pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing."